**CONSENT DECREE APPENDIX A:**
**JULY 2018 SEWER PARTICIPATION SERVICE AGREEMENT AND PERMIT**
*United States v. Henningsen Foods, Inc.*

# SEWER PARTICIPATION SERVICE AGREEMENT AND PERMIT

This Agreement, made and entered into this _23_ day of ___July___, 2018, between the City of David City, a municipal corporation of the County of Butler and State of Nebraska, hereinafter referred to as City, and Henningsen Foods, Inc. a New York corporation, authorized to do business in the State of Nebraska, hereinafter referred to as Company.

RECITALS:

WHEREAS, the Company operates an egg-breaking, processing and manufacturing plant within the geographical boundaries of the City with said processing plant being connected to the city sewerage collection and processing system;

WHEREAS, the City, recognizing an obligation to provide adequate sewage treatment facilities for its inhabitants, both domestic and industrial, built a new waste water treatment facility in 1997/1998 and continues to operate that treatment plant;

WHEREAS, the City and the Company entered into an agreement on March 13, 1997 wherein Company shared with the City in the cost of construction of such new waste water treatment facility, with Company agreeing to reimburse the City for 54% of that capital cost of the City's actual construction costs of said waste water treatment facility; and those capital cost payments will continue until December 2018, at which time the capital cost debt will be retired;

WHEREAS, the City and Company entered into an agreement dated November 9, 2016 which superseded the 1997 agreement;

WHEREAS, the Company is in the process of permitting and constructing a new pH neutralization and waste water equalization system which shall pretreat and equalize the Company's waste water prior to its entry into the City's sewer system (the "Pretreatment System"); and

WHEREAS, the City now has plans to improve the treatment plant by constructing a new anaerobic lagoon and related projects, and the City and Company are now desirous of entering into a new agreement providing an equitable division of future costs based upon usage of said

waste water treatment facility, with the intent to have this Agreement supersede all prior agreements between the parties;

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties agree as follows:

## TREATMENT FACILITY USAGE

1. The Company agrees to use the City's waste water treatment facility and the City shall accept, treat, process and dispose of waste and sewage originating at the Company's plant.

   a. Specifically, the City's waste water treatment facility shall receive, and the Company shall have the right to discharge no more than 150,000 gallons per day hydraulic flow (the "Volume Limit") with a BOD of 2,781 pounds per day, TSS of 700 pounds per day, and TKN of 290 pounds per day (collectively, the "Organic Load Limits"). The Company currently has two (2) locations where its waste water enters the City sewer, one called Outfall 101 and the other called Outfall 202. Outfall 202 will be eliminated because waste currently discharged there will be re-routed to Outfall 101 with construction of the new Pretreatment System.

   b. For purposes of determining the Company's compliance with the Organic Load Limits and for purposes of determining whether any surcharges should be assessed against the Company, as described in Section 12 of this Agreement, the Company's effluent shall be sampled on five (5) consecutive days each month using flow-proportional sampling techniques. (For the avoidance of any doubt or confusion, the Parties acknowledge here that pH shall be sampled using *time-proportional* sampling techniques as described in Section 13 of this Agreement.) All determinations as to the Company's compliance and whether surcharges should be levied shall be based on the five (5)-day average (Monday – Friday work week) of the test results. The Organic Load Limits shall be revisited and may be increased or decreased after the completion of the new anaerobic lagoon, at the City's or Company's request, and as outlined in Section 11.

c. The pH of the Company's effluent (measured at the point where it passes from the Company's facility into the City sewer system, as described in Section 13 of this Agreement) shall not fall below 5.5 S.U. or exceed 10.5 S.U. (the "pH Limits"). (Contrary to past practices, this Agreement does not and the City shall not impose on Company a pH influent limit, meaning a limit applied and measured at the inlet to or anywhere inside the City waste water treatment facility.) For purposes of determining the Company's compliance with the pH Limits, the Company's effluent shall be sampled, as further described in Section 13, via the automatic pH daily monitoring equipment currently in use (or reasonable substitutions and replacements thereof) and reported on Flow Link on a daily average, maximum, and minimum basis, per effluent monitoring location. The Company shall not be deemed out of compliance with the pH Limits unless the twenty-four (24) hour average of daily samples (beginning at 12:00 a.m. and ending at 11:59 p.m. each day) demonstrates that the pH Limits have been exceeded. The sampling equipment shall be well-maintained and probes shall be calibrated by the City according to the manufacturer's instructions. Probe calibration shall be checked and if necessary recalibrated by the City each week day. Probe checks and calibrations shall be logged by the City. The City shall make the calibration logs available to the Company on a weekly basis, and whenever the Company requests the logs.

d. Unless the context requires otherwise, the following terms shall be defined as follows:

➤ Biochemical Oxygen Demand (BOD) shall mean the quantity of oxygen utilized in the biochemical oxidation of organic matter under the standard EPA-approved laboratory test method in five (5) days at 20 degrees centigrade, expressed in milligrams per liter (mg/l).

➤ Total Suspended Solids (TSS) shall be defined as solids that either float in sewage or are in suspension in sewage that are removable by an EPA-approved laboratory filtration device expressed in milligrams per liter (mg/l).

4834-2196-7213, v. 1

> Total Kjeldahl Nitrogen (TKN) shall be defined as the total organic and ammonia nitrogen, expressed in milligrams per liter (mg/l), contained in sewage as determined by using EPA-approved Kjeldahl method.

> pH shall be defined as the concentration of hydrogen ions in an aqueous solution as a measure of acidity or basicity expressed in Standard Units (S.U.), as determined by an EPA-approved method.

2. The Company shall not discharge any waste water which exceeds Company's allocation as set forth above in Section 1 either as to quantity or content of waste water. Should Company exceed such allocations a surcharge shall be assessed in accordance with the formula set forth in Section 12 of this Agreement. In the event that such waste water shall cause the imposition of a fine or penalty for noncompliance with the National Pollutant Discharge Elimination System ("NPDES") Permit assessed by the Nebraska Department of Environmental Quality or the U.S. Environmental Protection Agency, Company shall be subject to remedies in accordance with Section 16 of this contract.

3. The Company shall not exceed the Volume Limit, Organic Load Limits or pH Limits and shall abide by this contract and all other laws and regulations applicable to the use of sanitary sewers and waste water treatment facility of the City, and the Company shall not introduce into the waste water treatment facility or its system any of those materials set forth in Section 2-2016 of the David City Municipal Code

4. Upon a determination by City that the waste water discharge by Company without pretreatment will be harmful to the structure, process or operation of the waste water treatment facility or detrimental to the quality of effluent being discharged from that facility, City shall have all remedies available to it under Section 3-225 of the David City Municipal Code as the same is in existence now or may be hereinafter amended.

### MONITORING FACILITIES AND ACCESS TO PROPERTY

5. To the extent not already completed, the City shall require the Company at Company's expense, to (a) construct and maintain a monitoring facility on Company property at a location approved by the Company to allow inspection, sampling and flow measurement

7/20/2018

of the lateral sewer or internal drainage systems and (b) allow sampling or metering equipment to be provided, installed, operated and maintained at the Company's expense. City shall also have the right to set up a monitoring device at such facility at City's expense.

6. Company shall allow authorized personnel of the City ready access, at all reasonable times, to monitoring facilities as described in Section 5 for inspection or sampling or for the performance of their duties. City shall have the right to set up on Company's property such devices as are necessary to conduct sampling or metering operations at City's cost and risk. While performing such work, City's personnel shall observe all safety rules established by Company and applicable to its plant or facilities and such personnel shall not interfere with the normal operations of Company's plant.

### SAMPLING METHODS AND PROCEDURES

7. The Company and City agree the following sampling methods and procedures shall be followed at all times unless otherwise provided for elsewhere in this Agreement or altered by signed written agreement of the parties:

   a. Subject to the other terms and conditions of this Agreement, the City shall be initially and primarily responsible for conducting all sampling and testing (through approved third-party laboratories) of the Company's waste water at the times and intervals specified in Section 1 of this Agreement. The City acknowledges the importance of its role and understands that its sampling and testing program shall be used by the Company for compliance reporting required under the Company's NPP Permit with the Nebraska NDEQ. The City further understands and acknowledges that the Company is specifically relying on the accuracy and veracity of the City's sampling and testing methods and procedures, and any errors or omissions committed by the City may cause the Company to incur damages.

   b. All measurements, tests, and analyses of the characteristics of Company's waste water shall be determined in accordance with the latest edition of "STANDARD METHODS FOR EXAMINATION OF WATER AND WASTE WATER" published by the American Public Health Association and American Water Works Association and shall

7/20/2018

be determined at the monitoring facilities located on the Company's property from samples taken at such monitoring facilities. Sampling shall be carried out by customarily accepted, EPA approved, methods to reflect the effects of waste constituents upon the waste water treatment works and to determine the existence of a possible hazard to life, limb, property and proper operation of waste water treatment facility.

c. As required by State and Federal Regulations, all sampling shall be representative of the Company's and City's actual waste streams. Pursuant to 40 C.F.R. Section 403.12(g)(3), all samples taken to determine organic loads shall be obtained through flow-proportional composite sampling techniques, unless time-proportional composite sampling or grab sampling is authorized by the Nebraska Department of Environmental Quality. All sampling shall be performed by a qualified, licensed individual. All State and Federal quality assurance and quality control standards shall be met for all sampling. All testing shall be performed by an EPA-accredited independent laboratory. Upon request of the Company, the City shall prepare a written sampling and analysis plan which shall set forth all methods, protocols, procedures, quality assurance and quality controls to be used by the City and Company during the term of this Agreement.

d. Split-sampling shall be conducted at the request of the Company. If requested by the Company, all samples taken by the City shall be immediately divided into two equal shares, one share for the City and one share for the Company. Each shall then have their shares tested by different EPA-approved independent laboratories, and the results of said testing shall be made available by each party to the other. In the event split-sampling is performed, the sampling costs incurred by the Company for its share shall be the responsibility of the Company.

e. Nothing in this Agreement shall preclude Company from collecting their own samples at any time. Further, at any time during the term of this Agreement, the Company may, in its sole and absolute discretion, decide to perform its own compliance sampling and testing. If the Company chooses to perform its own compliance

sampling, it shall: (i) do so at its own expense, (ii) regularly report the results to the City for purposes of demonstrating compliance with this Agreement, and (iii) shall no longer be required to reimburse the City for its sampling and testing expenses.

8. Any disputes between the Company and the City regarding sampling methods, procedures and results shall be resolved through the dispute resolution procedures provided for in Section 18 of this Agreement.

## COMPANY SEWER SYSTEM MAINTENANCE ASSESSMENT

9. Annually, as a component of the City's annual budget process, the City shall prepare a WWTF budget which shall serve as the basis for an annual sewer system maintenance assessment charged to the Company. The general procedures for making the budget and assessment shall be as follows:

   a. The annual cost for sewer system maintenance shall be determined by the City or its representative and shall include all annual costs for labor, insurance, rodent control, repairs, supplies and freight, office supplies, electricity, gasoline and oil, natural gas, mechanized sewer cleaning, sand and gravel, and a reasonable contingency fund for the sewer system including collection system and lift stations, but excluding any costs related to the waste water treatment facility (the "Annual Non-WWTF Costs"). Annually, before the 1st day of October, City shall present to Company a summary of such annual costs and Company's proportionate share thereof as determined below. Within thirty (30) days of receipt of such statement, Company shall have the right to appeal to the City Council the records and figures used in deriving the Company's proportionate share of such annual costs. Company shall have a period of an additional fifteen (15) days from the date of receipt of such records to conduct its own audit of such costs. After consideration of the appeal by Company, City shall notify Company of its final decision. Should Company disagree with such final decision, any dispute shall be resolved as provided in Section 18 of this Agreement.

   b. The Annual Non-WWTF Costs, as set forth above, shall be separately identified in an annual budget adopted by City. Such annual cost for sewer system maintenance shall

7/20/2018

be prepared by the City on a monthly basis. The Company's proportionate share of the annual assessments shall be, based upon the following formula:

Company's Share Sewer Maintenance = $(Y/Z)X$

X=Sewer Maintenance Budget or Annual Non-WWTF Costs

Y=Length of Sewer Used by Company

Z=Total Length of all of City Sewers

Such proportionate assessments to Company shall be determined by City in accordance with established costs incurred by the City to repair, service and collect waste water from Company and other commercial, industrial and residential users. Should there be a significant increase in the costs attributed thereto, this allocation shall be reviewed with the Company and shall be subject to an adjustment by ordinance or resolution of the City Council. The Company's current proportionate share is Eight and Nine-Tenths Percent (8.9%).

c. In the event of major repairs to the City sewer system or replacement of a major portion thereof proposed and planned after the date of this Agreement, the City will determine the assessment costs for such repairs and levy the same on a use basis between commercial users, individual, residential users and Company; provided, however, it is specifically understood and agreed that the assessment to the Company shall include only its proportionate share of the cost of major repairs to be performed on that part of the sewer system actually used by the Company. The Company shall not be required to share in the cost of lagoon clean-out or sewer repairs and maintenance that are included in the current capital improvement plan, further described in Section 10 (b), or any other costs that are not related to the construction of the anaerobic lagoon and associated project components. The City shall pay the cost of the lagoon clean-out, sewer repairs and maintenance and all other costs included in the current capital improvement plan that are not related to the construction of the anaerobic lagoon and associated project components.

7/20/2018

## COMPANY CUSTOMER CHARGE

10. In addition to the sewer system maintenance costs, the City shall also assess the Company for the City's proportionate fixed costs, capital costs, and variable costs as follows:

    a. <u>Proportionate Fixed Cost.</u> Until adjusted as hereinafter provided, on a monthly basis, Company shall pay to City, a monthly charge equivalent to Fifty-Eight percent (58%) of the annual estimated fixed operations, maintenance, repair, and capital costs of the waste water treatment facility divided by twelve for City fiscal year October 1 to September 30, annually, and then such percentage shall be annually adjusted for each subsequent twelve-month period that this contract is in force based upon actual, unadjusted sampling data gathered during the preceding twelve-month period. Usage during the previous twelve-month period shall be the average organic loads in the Company's effluent for the twelve-month period, based on actual, unadjusted data. Proportionate fixed costs shall include the fixed cost of operating the new anaerobic lagoon to be constructed under the current capital improvement plan. Any dispute regarding the allocation of proportionate fixed costs shall be resolved as provided in Section 18 of this Agreement.

    b. <u>Current Capital Improvement Plan.</u> The City has a current capital improvement plan which includes the construction of an anaerobic lagoon, as described in the design memorandum dated May 2, 2017 prepared by the City's consulting engineers, Olsson Associates. The City and Company hereby agree that the Company's proportionate share of the cost of the current capital improvement plan shall be Sixty-Five Percent (65%) of not more than $2,339,000.00. For the avoidance of any doubt, the Company's share shall not exceed $1,520,350.00 payable in equal monthly installments over the term of this Agreement. To the extent the actual cost of constructing the anaerobic lagoon and associated components is less than $2,339,000.00 the Company shall receive a proportionate share of the cost savings through a credit to the amount of capital costs it has agreed to pay in this Section 10 (b). The Company shall not be required to share in the cost of lagoon clean-out or sewer repairs and maintenance that are included in the current capital improvement

4834-2196-7213, v. 1

plan, or any other costs that are not related to the construction of the anaerobic lagoon and associated project components.  Any dispute regarding the allocation of costs associated with the current capital improvement plan or otherwise arising under this Section 10 (b) shall be resolved as provided in Section 18 of this Agreement.

c.  Future Capital Improvement Costs.  In the event it is deemed necessary to undertake additional capital improvements to the waste water treatment facility, City shall notify Company of its intention to conduct a facility study and shall ask Company for its input on such study.  If, after such facility study, it is deemed necessary to undertake capital improvements with respect to the waste water treatment facility, such proportionate share of the bonded indebtedness and other fixed operation and maintenance and repair costs shall be determined based on actual, unadjusted data, for the immediately-preceding thirty-six (36) month period with respect to flows and contents of such flows, attributed to the City and to Company necessitating the undertaking of such capital improvements.  Subject to the City's duty to indemnify the Company as provided in Section 17 of this Agreement, all such costs of capital improvements shall then be allocated between the City and Company in direct proportion to the actual, unadjusted relative utilization of such capital improvements. In establishing the relative proportionate shares for capital improvements, a committee composed of two representatives from Company and three representatives from the City, as appointed by the Mayor of the City, such representatives to include one member of the City staff or City council, the waste water treatment facility operator and a professional engineer employed by the City. The waste water treatment facility operator shall serve as chairman of said committee and shall only vote on matters in the event of a tie.  Said committee shall make recommendations to the City Council, which shall by ordinance or resolution, duly adopt and determine the relative allocation of bonded indebtedness and other fixed operation, maintenance and repair costs attributable to any such capital improvement to the waste water treatment facility.  At the time of adjustment occurring by reason of the completion of a capital improvement to the waste water

facility, but subject to the City's duty to indemnify the Company as provided in Section 17 of this Agreement, nothing shall prohibit an adjustment of the proportionate share of such items allocable solely to the capital improvement. Before adoption of such resolution or ordinance, Company shall be notified of the action desired to be taken by City and shall have thirty (30) days from the date of such notification to ask the Council for review of its decision. Upon the adoption of a resolution or ordinance in respect to the allocation of the costs of any capital improvement, such allocation shall be applicable to the next full monthly billing cycle first occurring after the date of adjustment. Any dispute regarding the allocation of future capital improvement costs shall be resolved as provided in Section 18 of this Agreement.

d. <u>Variable Costs.</u> On a monthly basis, Company shall also pay to City a monthly charge for variable operations, maintenance and repair costs which shall take into account the relative usage by Company. Such variable operations, maintenance and repair costs shall be defined as all those costs attributable to the waste water treatment facility other than fixed costs.

The formula to be utilized in determining the variable costs to be paid by Company shall be as follows, and shall be reviewed and adjusted annually:

i.   $C_u = W * C_t V_u/V_t + X * C_t B_u/B_t + Y * C_t S_u/S_t + Z * C_t T_u/T_t$

ii.  For purposes of the above formula, the variables shall be defined as follows:

W, X, Y, Z = Annually adjusted variable Volume, BOD, TSS, and TKN rate factors, respectively.

$C_t$ = Total portion of facility Variable Operation, Maintenance and Repair Costs per unit of time.

$C_u$ = A user's charge of Variable Operation, Maintenance and Repair Costs per unit of time.

$B_t$ = Total unadjusted BOD contribution from all users per unit of time.

4834-2196-7213, v. 1

$B_u$ = Total BOD contribution from the Company per unit of time.

$S_t$ = Total unadjusted TSS contribution from all users per unit of time.

$S_u$ = Total TSS contribution from the Company per unit of time.

$V_t$ = Total unadjusted volume contribution from all users per unit of time.

$V_u$ = Volume contribution from the Company per unit of time.

$T_t$ = Total unadjusted TKN contribution from all users per unit of time.

$T_u$ = Total TKN contribution from the Company per unit of time.

Any dispute regarding the allocation of variable costs shall be resolved as provided in Section 18 of this Agreement.

## DETERMINATION OF ALLOCATIONS TO FIXED AND VARIABLE COSTS

11. Annually, as a component of the City's annual budget process, a committee composed of representatives from Company and representatives from the City as appointed by the Mayor of the City, composed as in Section 10 (c), shall review all items of expenses associated with the operation of the waste water treatment facility for purposes of establishing what costs should be allocated to fixed costs, maintenance and repair costs and what costs should be allocated to variable costs in respect to the City's budgetary process. Prior to the adoption of the budget of the City, the committee so established shall report to the City and make its recommendations with respect to the proper budgetary allocation of fixed costs, maintenance and repair costs and variable costs for the operation of the waste water treatment facility. Based upon the recommendation of the committee, the City, by proper ordinance or resolution duly adopted, shall then establish what portion of the budgetary costs attributable to the waste water treatment facility constitute fixed costs and what portion constitute variable costs. Any dispute regarding the allocation of fixed and variable costs shall be resolved as provided in Section 18 of this Agreement.

4834-2196-7213, v. 1

## SURCHARGES

12. In the event the Company's effluent exceeds the Volume Limit or any of the Organic Load Limits, the Company shall pay surcharges to the City for excessive volume and/or strength of effluent based upon the following provisions:

   a. <u>Volume, BOD, TSS, and TKN Surcharge.</u>  All sampling shall be performed as agreed in Section 1 of this Agreement.  On a five-day basis, the average daily waste discharge of Company based on actual, unadjusted data shall be calculated and in the event the five-day average exceeds one or more of the Organic Load Limits or the Volume Limit, a daily surcharge shall be calculated for the waste components that exceed the limits. The surcharge shall be expressed in cents per pound or cents per gallon based on the City's actual cost to treat the waste component in question, as determined in Section 12(b) of this Agreement.  The surcharge shall be multiplied by the number of calendar days between routine sampling activities beginning on the last day of the five-day sampling period to the start of the next five-day sampling period to obtain the total number of days in the period being subject to surcharge.  Then the surcharge for that period shall be determined by multiplying the number of days in the surcharge period by the cost to treat the waste per the formula provided for in Section 12 (b).  The portion of the total surcharge that occurs in each billing period shall be added to the billing to be paid by Company on a monthly basis.  The Company shall have forty-five (45) days after receipt of their bill to object to any such surcharges by email or letter delivered to the City Clerk.  The City and Company shall then meet to attempt to resolve the surcharge dispute.  If they are unable to resolve the dispute, the dispute shall be resolved as provided in Section 18 of this Agreement.

   b. <u>Formula.</u>  The daily surcharge shall be calculated in accordance with the following formula:

   i.  $SC = [R_p (P_t - P_m) + R_c (S_t - S_m) + R_t (T_t - T_m) + R_v ((V_t - V_m)/1{,}000)]$

4834-2196-7213, v. 1

ii.    For purposes of the above formula, the variables shall be defined as follows:

$P_m$ = BOD in allocated waste water defined as 2,781 pounds per day.

$P_t$ = BOD in waste water in pounds per day.

$R_c$ = TSS treatment cost per pound per day.

$R_p$ = BOD treatment cost per pound per day.

$R_t$ = TKN treatment cost per pound per day.

$R_v$ = Treatment cost of flow per 1,000 gallons.

$T_t$ = TKN in waste water in pounds per day.

$T_m$ = TKN in allocated waste water defined as 290 pounds per day.

$S_t$ = TSS in waste water in pounds per day.

$S_m$ = TSS in allocated waste water defined as 700 pounds per day.

$V_t$ = Volume of waste water generated by user in gallons per day.

$V_m$ = Volume of waste water allocated to user defined as 150,000 gallons per day.

iii.    For purpose of the above formula, $R_c$ shall equal zero cents ($0.00) per pound, $R_p$ shall equal thirty-five cents ($0.35) per pound, $R_t$ shall equal seventy-nine cents ($0.79) per pound, and $R_v$ shall equal eighty-nine cents ($0.89) per 1,000 gallons. The treatment cost for each surcharge component shall be reviewed on an annual basis and recalculated as required to incorporate the fixed and variable costs determined in accordance with Section 11.

## INCIDENT CHARGES

13. The City may assess incident charges to the Company as follows:

a. In case of an incident occurring which requires the waste water treatment facility operator to be called to the facility at other than normal working hours, a $500.00 incident charge shall be levied. For purposes of this Agreement, normal working hours

are defined as 7:00 a.m. to 4:00 p.m., Monday through Friday. The City agrees it shall not impose more than one (1) such incident charge per day.

b. Further, if any flow-proportional discrete sample within a twenty-four (24) hour period (7:00 a.m. to 7:00 a.m.) exceeds a concentration of 13,400 mg/l COD in any one discrete sample, an incident charge of $250.00 shall be levied whether or not the operator was called out, unless the Company notifies the City WWTF to expect an excessive BOD/COD load within one (1) hour of occurrence of an incident at the Company's plant that may cause such excessive load.

c. The City may impose one (1) incident charge per day if pH test results indicate the Company's effluent falls outside either the upper or lower agreed-upon pH limit, on an "average basis," during the 12 hours of highest flows from the outlet of the Company's neutralization system into the inlet to the City sewer system located on the Company's property on any given calendar day. The term "average basis" shall mean the average of all automatic pH readings (12 per hour) taken during the 12 hours of highest flows using time-proportionate sampling techniques recognized and approved by the Nebraska Department of Environmental Quality and U.S. EPA.

d. For the first thirty (30) months of this Agreement, all funds received by the City for COD incident charges shall be set aside by the City to be expended for construction of the new anaerobic lagoon. On April 1, 2019, the COD incident charges shall increase to $500.00, and there shall be no restriction on use of said incident charges by the City.

e. Probe calibration shall be checked each week day and logged by the City. The City shall make the calibration logs available to the Company on a regular basis, or upon request.

## DELINQUENT ACCOUNTS

14. All sums due in accordance with this contract shall be paid to City monthly and shall be immediately due and payable upon the receipt by Company of a statement itemizing the sums so due. Unless payment shall have been received within thirty (30) days from the date of receipt of billing, such unpaid sums shall be deemed delinquent and shall accrue

4834-2196-7213, v. 1

interest at the rate of one percent (1%) per month from the delinquency date of said bill. In the event Company shall fail to pay all sums due in accordance with the provisions of this Agreement within three (3) months of the receipt of a billing, City may discontinue supplying services to Company's property until such time as said bill shall be paid.

Should Company contest its bill, it shall have fifteen (15) days from the receipt thereof to contest the same by so notifying the City Clerk. Company shall have the right, during the fifteen (15) day period to request verification of said bill. After City has reviewed said bill and reached a final decision thereon, should Company disagree with said decision, any dispute shall be resolved as provided in Section 18 of this Agreement.

## LIEN RIGHTS

15. City shall also have the right to declare any and all delinquent payments due to City in accordance with this Agreement a special assessment tax and certify the same to the Butler County Clerk and Treasurer's office to be included in the real estate taxes of the property to which such delinquent payment relates, to the extent permitted by law.

## REMEDIES FOR VIOLATION OF DISCHARGE LIMITATIONS

16. Should the City determine that Company is violating the covenants of this Agreement, the following provision shall be applicable:

   a. Upon determination that there is reasonable cause to believe that a provision of this Agreement is being violated at the premises of Company, the City Clerk, when so notified by the waste water treatment facility operator, shall notify Company in writing stating the nature of the violation and providing a reasonable time for correction to be made. Both parties, City and Company, shall use their best efforts to resolve the problem as contained in the notification by the City Clerk. In the absence of unusual circumstances, fifteen (15) days shall be considered a reasonable time. Company, upon receipt of the notice, shall report to the City Clerk within fifteen (15) days, in writing, stating what action has been taken or is being taken to correct the condition constituting the violation. If Company does not correct the violation within

4834-2196-7213, v. 1

such time limit, or with any extensions of time granted by the City Council, the City Clerk shall cause one or more of the following to occur:

    i.   Terminate services to premises of Company, after Company has failed to correct such problem after such fifteen (15) days' notice and any extension of time, and after the City Council has approved such termination. Such termination shall continue until Company has satisfactorily corrected the problem;

    ii.   Cause the City to initiate court action to enforce compliance with this Agreement;

    iii.   Declare all sums owing for services immediately due and collectible; or

    iv.   Start court action for the levy of a fine for violation of this Agreement.

b. Election by the City Council to terminate services shall not release Company from its obligations to pay sums owing hereunder if termination was proper under the provisions of this Agreement and all delinquent payments hereunder shall draw interest at the rate of One Percent (1%) per month or Twelve Percent (12%) per annum. Furthermore, should City properly terminate services under the terms of this contract, City shall not be liable for any damages that may result by virtue of such termination suffered by Company in the event of ceased production.

c. Should Company be aggrieved by any notice sent by the City Clerk in accordance with this section, Company may obtain a hearing by the City Council, upon a written request. The written request must be filed with the City Clerk within the time for correcting any violations or within any extension of time granted by the City Clerk. Such written request will postpone the date that the work is required to be completed until after the hearing, provided, however, that the City Clerk will set the date for hearing as early as possible after receiving the request for hearing. At such hearing, Company may present any facts or arguments which Company desires to present, may be presented by counsel and may present such expert testimony or technical evidence as is necessary to establish the contentions of Company. Such hearing may be recorded by a court reporter if requested by either party, at the expense of the

requesting party. After hearing, the City Council may continue the original order in effect, modify the order or withdraw the order depending on the facts shown at the hearing.

d.  Should Company be aggrieved by any decision of the City Council under the provisions of this Section 16, Company may, at its option and in its sole discretion, appeal such decision directly to any Nebraska court having jurisdiction over the matter without regard to the dispute resolution procedures provided for in Section 18.

### INDEMNITY

17. In the event that Company does discharge excessive amounts of pollutants in violation of the National Pollutant Discharge Elimination Permit or other regulations of the U.S. Environmental Protection Agency and Nebraska Department of Environmental Quality, Company shall, by utilization of the waste water system of the City, be obligated to indemnify and hold the City harmless against from and any all losses, damages, claims, demands, actions, causes of action, penalties, judgments, costs and expenses of whatsoever nature which may result from injury to, or death of, persons or results in the City being in violation of state or federal regulation or regulatory agency requirements, when such violation, injury, death, loss, destruction or damage arises in any way in connection with, or incident to Company depositing amounts of waste water in excess of those permitted by this Agreement into the City's sanitary sewers. It must be proved, on a case by case basis that Company's depositing excessive amounts of pollutants, on a daily basis, was in fact the cause of a violation, injury, death, loss, destruction or damage and that such excessive discharge was not due to a force of majeure, any fault of City or that of any third party.

The City acknowledges that the Company is following the current capital improvement plan put forth by the City and its consulting engineers and is making a contribution in good faith and in reliance on the representations of the City's engineers that the plan will work. If the plan does not work, the City and its engineer shall take the steps necessary to correct, improve, modify or supplement the system and pay all necessary costs so that

the City's waste water treatment system meets NPDES permit limits at no additional cost to Company. The City agrees to defend, indemnify and hold the Company harmless against from and any all future costs and expenses of whatsoever nature, including without limitation additional capital construction costs, which may result from the failure of the new lagoon to perform as represented by the City's engineers.

## DISPUTE RESOLUTION

18. Except as otherwise provided in this Agreement, the Company and the City agree to exercise good faith and fair dealing to resolve all disputes arising under this Agreement according to the following procedures:

    a. Unless stated otherwise in this Agreement, if the Company disagrees, in whole or in part, with any decision made by the City pursuant to this Agreement, the Company may notify the City Clerk in writing of the objections and the bases therefor within ten (10) days of receipt of the City's decision. The City and the Company shall then have an additional twenty (20) days from the City's receipt of the Company's objections to attempt in good faith to resolve the dispute, unless an extension of time is agreed to by both parties. The parties agree to use their best efforts to informally and in good faith resolve all disputes. If agreement is reached, the resolution shall be reduced to writing, signed by representatives of the Company and the City and implemented.

    b. If the parties are unable to reach an agreement within the initial twenty (20) day period as extended by mutual agreement, the Company shall, within seven (7) days, provide a written notice and demand for arbitration to the City Clerk. The notice shall state specific points of the dispute remaining from its original notice of dispute, the factual and legal bases for the Company's position, and all matters it considers necessary for resolution of the identified matters in dispute. The City shall provide written responses to the Company's notice of dispute to the Company.

    c. Thereafter, the matter shall be determined by final and binding arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules and Mediation Procedures ("Commercial Rules"). The laws of the State of Nebraska shall govern. The dispute shall be decided by one arbitrator

4834-2196-7213, v. 1

selected and agreed to by the parties within twenty (20) days of receipt by the City of the request for arbitration or in default thereof appointed by the AAA in accordance with its Commercial Rules. The decision rendered by the arbitrator shall be final and binding on the parties and may be entered and enforced in any Nebraska court having jurisdiction.

## AUDIT RIGHTS

19. At any time during the term of this Agreement, on thirty (30) days advance notice and during regular business hours, the Company or its representatives may audit the City's cost records, testing records, assessment records and other documents relating to this Agreement and the Company as necessary to verify compliance with the terms and conditions of this Agreement. The City shall reasonably cooperate with the Company in conducting any such audit. If any audit reveals an underpayment of any amount due the Company or an overcharge of the fees or other charges paid or to be paid by the Company under this Agreement, then the City shall correct the underpayment or overcharge by paying the Company all sums due in full within thirty (30) days after receiving a written auditor's report and substantiation of the inaccuracy. If the audit reveals an overpayment greater than Ten-Thousand Tollars ($10,000.00) in any calendar year, then the City shall reimburse the reasonable costs of the Company in performing the audit, including without limitation, fees, travel and lodging costs, of any professionals engaged by the Company to perform such audit, in addition to the amount of the underpayment. Any dispute arising under this provision shall be resolved as provided in Section 18 of this Agreement.

## INTERRUPTION OF SERVICE BY CASUALTY

20. City shall not be liable for failure to transport or treat waste water of Company if such failure arises from any cause of circumstances beyond the reasonable control of City, including federal or state court order, damage to or incapacity of the sewer system or the waste water treatment facility resulting from fire, flood or other casualty or natural disaster. In the event of any failure, breakdown or interruption of sewage treatment

services contracted hereunder, City shall use its best efforts to promptly reactivate the operation of the waste water treatment facility and sewer system.

## OWNERSHIP

21. Company shall not, for any purposes, be construed as having any ownership interest in the waste water treatment facility or its collection system.

## RESERVATION OF CAPACITY

22. City by virtue of this Agreement, reserves for Company, for so long as Company pays its obligations under this Agreement, a capacity for treatment of 150,000 gallons per day of hydraulic flow containing BOD of 2,781`pounds per day, TSS of 700 pounds per day, and TKN of 290 pounds per day.

## ASSIGNABILITY OF COMPANY'S INTEREST

23. Should Company cease business in David City, Nebraska, or greatly reduce its discharge into the City's waste water treatment facility, then, subject to prior approval of the City Council, Company shall have the right to assign or transfer such reserved capacity in the waste water treatment facility to another company or to City. The City's approval of assignment or transfer of such capacity by Company shall not be unreasonably withheld by City.

## CHANGE IN DISCHARGE STANDARDS

24. It is hereby agreed to and understood between City and Company that state and federal discharge standards relating to effluent being discharged from the waste water treatment facility may change in the future. Should such standards require a change in City waste water treatment facility, the parties hereto agree to evaluate their participation in the cost of such improvements required by state and federal agencies to be constructed by the City in order to meet then prevailing state and federal health standards.

## TERM OF AGREEMENT

25. This Agreement shall be for a term of twenty-five (25) years commencing on *July 23*, 2018, and thereafter shall be renewed for an additional period of not less than fifteen (15

4834-2196-7213, v. 1

years. After the initial renewal period, the parties may renew or extend this Agreement for such periods of time as they may agree upon. The City will pledge this Agreement to the USDA Rural Development as part of the security for their financial assistance to the City. Company may terminate this Agreement at any time upon three (3) months written notice delivered to City in person or sent by certified mail, return receipt requested to the City Clerk of David City, Nebraska.

## EFFECTS OF TERMINATION

26. Should Company seek to terminate the Agreement, such termination shall in no way relieve Company of its obligation to pay the Company's proportionate share of the cost of the current capital improvement plan in the amount and according to the schedule set forth in Section 10 (b) of this Agreement.

## ENTIRE AGREEMENT

27. This Agreement embodies the entire agreement and understanding between the parties hereto. It supersedes all prior agreements, oral or written, and may be modified or amended only by an instrument in writing signed by the parties hereto.

## COMPLETION OF CURRENT CAPITAL PROJECT

28. The City and Company agree that, upon completion of the city's new anaerobic lagoon and associated equipment they shall meet and discuss any changes to this Agreement that may be necessary or advisable, and agree to work together in good faith to make any amendments to this Agreement that may come about as a result of such discussions.

## GOVERNING LAW

29. This Agreement shall be construed and governed in accordance with the laws of the State of Nebraska.

[The remainder of this page is intentionally blank.]

4834-2196-7213, v. 1

IN WITNESS WHEREOF, the parties, acting under authority of their respective governing bodies, have caused this Agreement to be duly executed in two or more counterparts, each of which shall constitute an original.

**COMPANY:**

**HENNINGSEN FOODS, INC,**
a New York corporation

By: _James Harshman_
Name: _James Harshman_
Title: _President & CFO –_
_HFI_

**Attest:**

_Joan E. Kovar_
**City Clerk**

**CITY:**

**CITY OF DAVID CITY, NEBRASKA,**
a municipal corporation

By: _Alan Zavodny_
Name: _Alan Zavodny_
Title: _Mayor_
_7-23-2018_

**USDA:**

**UNITED STATES DEPARTMENT OF AGRICULTURE, RURAL DEVELOPMENT,**

APPROVED:

By: _____
Name: _FOR KARL ELMSHAEUSER_
Title: _STATE DIRECTOR_

STATE OF NEBRASKA            )
                            )
COUNTY OF Douglas           )

The foregoing instrument was acknowledged before me on the _20_ day of
_July_____, 2018, by James Harshman, President and CFO of Henningsen Foods, Inc.,
a New York Corporation authorized to do business in the State of Nebraska.

_Elizabeth Hansen-Hoeschen_
Notary Public

My Commission expires _Jan 18 2019_

GENERAL NOTARY - State of Nebraska
ELIZABETH HANSEN-HOESCHEN
My Comm. Exp. January 18, 2019

STATE OF NEBRASKA            )
                            )
COUNTY OF Butler            )

The foregoing instrument was acknowledged before me on the _23rd_ day of
_July_____, 2018, by Alan Zavodny, Mayor of David City.

_Tami L. Comte_
Notary Public

My Commission expires _Jan. 25, 2022_

GENERAL NOTARY - State of Nebraska
TAMI L. COMTE
My Comm. Exp. January 25, 2022

STATE OF NEBRASKA            )
                            )
COUNTY OF Lancaster         )

The foregoing instrument was acknowledged before me on the _8th_ day of
_August_____, 2018, by _Karl Elmshaeuser_ USDA Rural Development State
Director.

_Luann M. Brown_
Notary Public

My Commission expires _2-10-2020_

GENERAL NOTARY - State of Nebraska
LUANN M. BROWN
My Comm. Exp. February 10, 2020

4834-2196-7213, v. 1